■ SHENIKWA D. NOWLIN, Respondent, v CITY OF NEW YORK et al., Appellants.—Judgment, Supreme Court, New York County (Ira Gammerman, J.), entered February 8, 1991, awarding plaintiff the principal sum of $9,086,000 against defendants City of New York and Robertson, jointly and severally, as reduced on consent after a jury verdict of $14,336,000, with liability apportioned 67% against the City and 33% against Robertson, unanimously reversed, without costs, on the facts and in the exercise of discretion, and the matter remanded for new trial on damages only, unless plaintiff stipulates to accept a reduced principal award of $7.5 million, in which case the judgment is affirmed.

Plaintiff, a 24-year old former ballerina and beauty queen from Dallas, about to enter her third year in law school, came to New York City in August 1983 to visit her best friend. While in New York she also expected to see defendant Robertson, a former college friend who was then an infielder for the New York Yankees. Robertson picked her up at the airport and dropped her at the friend's apartment, with plans to meet her the next day. Instead, Robertson telephoned plaintiff after the baseball game that night and invited her to go dancing at

Studio 54. Neither had ever been there before, and plaintiff was quite excited about going. The couple were old friends, not romantically involved, and so they danced a little and caught up on old times. Robertson did not drink any alcohol. They left the club between 4:00 and 4:30 A.M., and since neither was tired, they decided to take the Staten Island ferry to see the Statue of Liberty at dawn. They first drove to Robertson's home in Fort Lee, New Jersey, to pick up his camera. He drove north to the Washington Bridge via the Harlem River Drive, and on the return they headed south along the Henry Hudson Parkway, a route Robertson had never before travelled. The traffic was light as Robertson drove his 1982 Buick Riviera at speeds he estimated at between 50 and 65 mph. (The City's automotive safety and accident reconstruction expert estimated the speed at 77-82 mph.) Neither was wearing a seat belt. It was still dark, with street lights and headlights still in use, as Robertson, travelling in the right-most of the three southbound lanes, neared 72nd Street, where the Henry Hudson Parkway becomes the elevated West Side Highway. At that junction, the road makes a "reverse-S" curve. Just at the start of the turn was a yellow traffic advisory sign warning of the reverse-S curve and establishing a 35 mph speed limit through this stretch. Robertson testified that he did not notice this sign until he was practically abreast of it. (He actually began braking about 67 feet before the sign.) Only then, as he applied the brakes, did he notice the concrete abutment of the curve straight ahead, and by that time he was unable to keep his vehicle from smashing into it. After evidently striking both the left and right retaining barriers, the vehicle flipped over, and plaintiff sustained serious injuries which have rendered her paraplegic.

The jury apportioned liability 67% against the City and 33% against Robertson, and returned a verdict of $14,336,000, of which $7,750,000 was for past and future pain and suffering. When the Trial Judge indicated his belief that this award was excessive, the parties stipulated to reduce the pain and suffering component by more than two-thirds, to $2.5 million, making the total award $9,086,000. We would reduce the economic loss component from $6,586,000 to $5 million, and otherwise affirm that total award in the amount of $7.5 million.

Two sets of color photographs of the stretch of highway between 79th Street and the curve at 72nd Street, taken in 1978 and 1981, were introduced in evidence at trial, along with a set of construction plans, dated 1962 and bearing

revisions through December 1984. This evidence established that goosenecked lamp posts are set along the straightaway between 79th and 72nd Streets, atop the outermost retaining abutments (sometimes called Jersey barriers), i.e., along the right lanes for both directions of traffic, at approximately 100-foot intervals. As the roadway crosses 72nd Street and becomes an elevated structure, it shifts to the right and the opposing lanes of traffic physically separate. Because of that separation, *each* structure (southbound and northbound), from that point on, has its own set of lamp posts on its own right and left retaining abutments. Between two and three sets of goosenecked lamp posts are configured through the curve, and these then give way to an older style lamp post as the side-by-side elevated structures resume the straightaway toward 57th Street.

This perhaps tedious description is important because the sequential photographs along the straightaway from 79th Street to 72nd Street reveal a startling optical illusion. Because the roadway shifts to the right for approximately the width of the three lanes before resuming the straightaway, the last three goosenecked lamp posts on the west abutment of the *northbound* lanes (at the far end of the curve) actually appear, from a distance, to be a linear continuation of the lamp posts running along the west abutment of the *southbound* lanes (prior to the curve). Thus, the illusion is created —especially for the uninitiated southbound traveller—of a continuous straightaway. This becomes crucial in determining the proper placement of signage warning of the approaching curve.

The plans appear to have called, as early as 1970, for a diamond-shaped reverse-S sign to be posted at lamp post H-9, and a 1977 revision called for posting of a 35 mph speed limit at the same location. Instead, that yellow warning signage was placed on lamp post H-6, approximately 300 feet farther south, at the very mouth of the curve.

There was a difference of opinion between expert witnesses as to whether Robertson, despite travelling at an excessive rate of speed, might still have been able to negotiate the curve with normal (rather than panicked) braking, had he had proper warning. But there was no dispute that this particular curve in the roadway was, in the words of plaintiff's expert traffic engineer, "a hazardous location." Another witness, an expert on "human factors in highway safety", testified that this "particularly sharp" curve, following abruptly on an otherwise straight stretch of highway, was so "out of charac-

ter with the rest of the roadway" that it would be "a surprise to any driver unfamiliar with the location." One retired highway patrol officer for the Police Department testified that he had personally investigated more than 50 single-car accidents at this spot while he was on the force, during 1979-1983. Another former police highway safety officer recalled at least 10 accidents between 1977 and 1981 involving a single automobile striking the median barrier at this curve. The photographs in the record—both the 1978 and 1981 sets, and the series of photos of this accident—also reveal considerable scuff marks and scarring of the median barrier and the outer abutment.

A comparison of the sequential photographs of this stretch of highway reveals that sometime between 1978 and 1981, white rectangular speed limit signs (40 mph) were posted on lamp posts H-15 and H-12,* roughly 800 feet and 600 feet north of H-6, where the yellow reverse-S and 35 mph signs were posted. The Department of Transportation's Manual of Uniform Traffic Control Devices establishes "advance posting distance" guidelines for various types of signage. The yellow curve warning is considered a "category II" sign, and the recommended advance posting distance for a 35 mph advisory for such a curve, when emerging from a 40 mph speed zone, is no less than 200 feet before the road condition in question. Lamp post H-9, where the plan called for posting of this warning sign since at least 1977, was safely beyond that distance from the curve, whereas lamp post H-6, where the signage was actually posted since at least 1978, was virtually at the mouth of that curve.

Robertson, unfamiliar as he was with this route, was nonetheless negligent in failing to heed two 40 mph signs within 800 feet of the curve. But the City's negligence with regard to the posting and maintenance of signage is also undeniable, in light of the advance posting guidelines, the City's own neglected plan for sign placement at H-9, and the multiplicity of single-car accidents at this deceptive location prior to the accident in question (cf., *Stanford v State of New York*, 167 AD2d 381, *lv denied* 78 NY2d 856). Apportionment of liability among defendants is a weight-of-evidence question for the trier of facts (*Chiodi v Soliman*, 174 AD2d 329). A fair interpretation of the evidence here supports a finding of

---

* On the southbound lanes, the equidistant lamp posts between the 79th Street ramp and the 72nd Street curve are numbered H-15, H-13, H-12 * * * H-6. For some reason, H-14 is on the opposite (northbound) side of the roadway.

greater culpability on the part of the City. We see no reason to disturb the reasoned determination of the jury on the question of apportionment of liability.

It is appropriate to note, at this point, that the case went to the jury not on a question of faulty road design, but rather on the question of negligent signage. The State may have been responsible for initial design and construction of this highway, but sign placement and maintenance were clearly functions assumed by the City *(cf., Nunez v City of New York,* 177 AD2d 394). Once the City undertakes such maintenance and safety functions at a hazardous location, it cannot later disclaim responsibility on the ground of lack of duty *(cf., Thompson v City of New York,* 78 NY2d 682).

The second major issue on this appeal concerns the size of judgment. The Trial Judge exacted a stipulated reduction of $5.25 million in the damages for past and future pain and suffering, and we would not disturb the resultant award of $2.5 million. However, we would adjust the award for economic loss. The jury awarded $1,550,000 for future equipment costs, $4,765,000 for future health care and assistance, $46,000 for future extra clothing costs, and $225,000 for an appropriate residence—a total of $6,586,000, which was already a reduction from the approximately $9.7 million sought by plaintiff. We believe the jury's itemization for economic loss, still inflated, should be further reduced to $5 million.

There was expert testimony that without excellent care, plaintiff would inevitably face complications in the nature of urinary tract infection, heart exertion, arthritis and tendonitis in the upper extremities, osteoporosis, decubitis ulcers, degenerative arthritis and thrombophlebitis over the 44.3 years of her remaining life expectancy. The jury considered such future health care and assistance items as treatment by medical practitioner, psychologist, orthopedic surgeon, urologist, cosmetic surgeon, anesthesiologist, MRI/CAT scan radiologist, dietician and physical/occupational therapist, as well as the cost of necessary hospitalization, specialized dental care, home nursing and medication. Equipment costs covered such items as wheelchairs, lift devices, a special bed, a customized van, splints and braces, and computerware and other office material suitable for use by a handicapped person.

Plaintiff now works as a City Attorney in Dallas. Without in any way minimizing plaintiff's situation or the challenges that lie ahead for her, we would nevertheless, in the exercise of discretion, adjust the award for economic loss as indicated. Concur—Carro, J. P., Wallach, Kassal and Rubin, JJ.